## HUSSMANN REFRIGERATION, INC.

### v.

**SOUTH PITTSBURG ASSOCIATES; Samuel M. Longiotti; First Delaware Equity Corporation; Mid-Atlantic Trading Corporation; Alfred's IGA Foodliner, Inc. a/k/a Aunt Martha's Country Market, Inc.; F.D.I. Management Corporation; Iva B. Ables Trust; Industrial Development Board of the City of South Pittsburg, Tennessee; and First National Bank of Atlanta, Georgia.**

Court of Appeals of Tennessee, Middle Section, at Nashville.

June 14, 1985.

Rehearing Denied July 12, 1985.

Permission to Appeal Denied by Supreme Court Sept. 23, 1985.

---

Richard P. Jahn, Jr., Tanner, Jahn, Anderson, Bridges & Jahn, Chattanooga, for plaintiff/appellant.

Michael W. Boehm, Gentry & Boehm, Chattanooga, for defendants/appellees.

## OPINION

KOCH, Judge.

This case involves an attempt by Hussmann Refrigeration, Inc. to impose a materialman's lien upon a shopping center owned and operated by South Pittsburg Associates, Inc.[1] Relying upon this Court's decision in *Knox-Tenn Rental Co. v. Sarbec Corp.*, 59 Tenn.App. 564, 442 S.W.2d 652 (1968), Hussmann seeks payment from SPA for certain labor and material costs it incurred in the installation of a refrigeration system in a supermarket operated by one of SPA's shopping center tenants. After the tenant's business failed and it filed for bankruptcy, Hussmann brought this action on September 27, 1982, in the Chancery Court for Marion County. On May 7, 1984, following the presentation of the plaintiff's proof, the trial court dismissed Hussmann's action on the basis that Hussmann had failed to prove the existence of an agency relationship between SPA and its tenant.[2] A final order dismissing Hussmann's action was entered on May 15, 1984. Hussmann has perfected this appeal and asserts that the trial court erred by determining that an agency relationship did not exist between SPA and its tenant who had contracted with Hussmann. Pursuant

---

1. Hereinafter, Hussmann Refrigeration, Inc. will be referred to as "Hussmann," and South Pittsburg Associates, Inc. will be referred to as "SPA."

2. SPA made a motion "for a directed verdict" at the close of Hussmann's proof. This was an improper motion since this case was tried without a jury. *City of Columbia v. C.F.W. Construction Co.*, 557 S.W.2d 734, 740 (Tenn.1977). The proper motion would have been one for dismissal in accordance with Tenn.R.Civ.P. 41.02(2). For the purpose of this opinion, we will treat SPA's motion as if it had been filed in accordance with Tenn.R.Civ.P. 41.02(2).

to Tenn.R.App.P. 13(a), SPA also presents three other issues for this Court's consideration.[3]

We affirm the decision of the trial court.

## I.

### The Facts

On January 9, 1981, Alfred's IGA Food Liner, Inc. [hereinafter referred to by name or as the "tenant"] and SPA's predecessor in title[4] entered into a lease agreement wherein Alfred's agreed to lease 25,596 square feet of ground area of a shopping center located in South Pittsburg. Under the terms of this lease, the space was

"... for use and occupation by Tenant, its successors and assigns, (when so operated) as a supermarket principally for the sale of food and other items generally sold by a food supermarket."[5]

Alfred's was to be one of the anchor tenants for this shopping center. The initial term of the lease was twenty-five years, although it contained an option for four successive five year renewals. The parties originally agreed upon rent in the amount of $117,741.60 per year; however, in a rider added to the lease, they also agreed that Alfred's would pay an additional sum equal to 1½% of its annual gross sales in excess of $8.5 million as rent.

This lease also undertook to define the parties' respective responsibilities and prerogatives with regard to the construction and equipping of the shopping center in general and the space leased by Alfred's in particular. The landlord agreed to construct the building as well as external utilities and connections using mutually agreed upon plans and to have the building ready by March 1, 1982, so that Alfred's would be able to install its "coolers, trade and other fixtures, heating and air conditioning and other equipment." In turn, Alfred's, without prior approval by its landlord, was given

"the right at any time during the term of this Lease, to install, use and operate in, upon and on the Demised Premises such furnishings, fixtures, (which term shall also include trade fixtures), equipment (including heating and air conditioning equipment), machinery and appliances as it may consider necessary in the conduct of its business in, upon or on said premises;"

Likewise, Alfred's was given the right

"at its sole cost and expense [to] alter or remodel the interior of the Demised Premises in any manner it may so elect, provided the structural strength and integrity is not impaired and provided such alterations or remodeling are in accordance with the requirements of local authorities having jurisdiction thereof."

Acting in accordance with its authority, Alfred's proceeded to contact Hussmann to obtain an estimate of the cost to install the refrigeration equipment to be used in its supermarket. Hussmann first received a plan for the supermarket and gave its estimate in November, 1981. At that time, Hussmann was aware that it was dealing with Alfred's only and that the supermarket was to be located in leased space. Hussmann never had any dealings with SPA, and Alfred's never gave Hussmann any reason to believe it was acting as SPA's agent.

Hussmann delivered the first walk-in coolers in December, 1981 because the interior design of the supermarket called for them to be built into certain of the interior walls. Hussmann also began to install the

---

3. The three issues raised by SPA could constitute independent legal grounds to defeat Hussmann's lien claim. Only one of the three, that pertaining to the timeliness of the notice of the claim of lien, was raised in the trial court. In light of our decision, we deem it necessary only to consider the issue pertaining to the agency relationship between SPA and its tenant.

4. Samuel M. Longiotti was also named as a defendant in this action. However, both parties agree that at some point subsequent to the execution of the lease, SPA acquired Longiotti's interest in the shopping center.

5. The lease also contained a restriction against leasing space in the same shopping center to another tenant who would be in substantial competition with Alfred's.

copper refrigerant piping in the floors and ceiling at that time. This piping was placed in conduits that had already been installed in the cement floor and was run above the removable ceiling. The remainder of the equipment was received and installed during the month of March, 1982. The installation was complete, with the exception of several temporary connections, and the system fully operational on March 30, 1982, the day of Alfred's grand opening.

As part of the grand opening festivities, Hussmann's operation's manager traveled from Atlanta to the store for the purpose of having Alfred's president sign "a stack of papers" evidencing the agreement between Hussmann and Alfred's. Among the "stack of papers" executed on March 30, 1982, was an Installment Sale and Security Agreement which, in its "Additional Provisions" section provided

> The Equipment shall remain personal property notwithstanding the manner in which the Equipment is or may be affixed to real property.

Hussmann also obtained a written, personal guaranty of payment from Alfred's president as well as written certificate that all equipment had been delivered and satisfactorily installed. The Installment Sales and Security Agreement was accepted by Hussmann on April 1, 1982, and was assigned to Hussmann Acceptance Company.

Within two months after this grand opening, Alfred's business failed, and it filed for bankruptcy under Chapter 11 on May 7, 1982. Alfred's president also filed for individual bankruptcy shortly thereafter. Hussmann had received no payment for its equipment.

Following the filing of Alfred's bankruptcy petition, Hussmann attempted to protect its interests by filing a lien against SPA's shopping center on June 29, 1982, in Marion County. Alfred's and SPA were personally served with a notice of this lien on the following day at a hearing in the bankruptcy court in Chattanooga. On July 9, 1982, Alfred's filed a complaint seeking to set aside Hussmann's lien claim as an improper transfer of an antecedent debt.

On August 11, 1982, Alfred's filed a notice in the bankruptcy court with regard to its intent to sell "all equipment, furniture, fixtures, shelving, cash registers, refrigeration equipment, all other items of personalty except for inventory and exclusive of items that are actually 'loaned' and not leased to the debtor" to Bruno's, Inc. for $375,000.

Hussmann filed this action on September 27, 1982, seeking to enforce its lien. As a result thereof, a writ of attachment was issued and served attaching the shopping center.

In October, 1982, the bankruptcy court appointed a trustee who assumed the role of debtor-in-possession for Alfred's. On May 26, 1983, the trustee recommended to the bankruptcy court that Hussmann's claims against Alfred's in the pending bankruptcy proceeding be settled by paying Hussmann $230,000 of the funds being held in escrow by the bankruptcy court. The bankruptcy court entered an order on May 26, 1983, authorizing the trustee to pay Hussmann $230,000 in full satisfaction for all the claims it had asserted in the bankruptcy proceeding.

SPA filed an objection to this proposed settlement on June 2, 1983, asserting that it was "unclear as to whether said compromise terminates Hussmann's lien claim and the suit in the Chancery Court of Marion County, Tennessee against South Pittsburg Associates (SPA)." On June 30, 1983, the bankruptcy court entered an order overruling SPA's objections stating that the settlement between Hussmann and the trustee should be approved without prejudice to Hussmann's right to pursue its lien claim against SPA in state court.

## II.

### The Relationship Between Alfred's and SPA

In order for Hussmann to prevail, it must demonstrate that Alfred's was acting as SPA's agent for the purpose of Tenn.

Code Ann. § 66–11–102(a) when it entered into the contract with Hussmann to supply the refrigeration equipment for its new supermarket. Tenn.Code Ann. § 66–11–102(a) provides:

> There shall be a lien upon any lot of ground or tract of land upon which a house or structure has been erected, demolished, altered, or repaired, or for fixtures or machinery furnished or erected, or improvements made, *by special contract with the owner or his agent,* in favor of the contractor, mechanic, laborer, founder or machinist, who does the work or any part of the work, or furnishes the materials or any part of the materials, or puts thereon any fixtures, machinery, or material, and in favor of all persons who do any portion of the work or furnish any portion of the materials for such building. [emphasis added]

As in the case with other lien laws, this statute should be construed strictly insofar as the existence of a lien is concerned but liberally so as to give effect to the lien once it has been established. *General Electric Supply Co. v. Arlen Realty & Development Corp.,* 546 S.W.2d 210, 213 (Tenn. 1977); *Arnstein Realty Co. v. Williams,* 163 Tenn. 69, 74, 40 S.W.2d 1007, 1008 (1931); and *Ford v. Whittle Trunk & Bag Co.,* 12 Tenn.App. 486, 491 (1930). At the close of Hussmann's proof, the trial court determined that it had been unable to carry its burden of proving that Alfred's was acting as SPA's agent when it purchased the refrigeration equipment.[6]

■ The determination concerning whether an agency relationship existed between Alfred's and SPA for the purpose of Tenn.Code Ann. § 66–11–102(a) should be made using legal principles generally applicable to other agency relationships. See 53 Am.Jur.2d *Mechanics' Liens* § 122 (1970). In the broadest sense, an agency relationship is one wherein the principal authorizes the agent to act for the principal's benefit but at the same time retains the right to control the agent's conduct. *Howard v. Haven,* 198 Tenn. 572, 583, 281 S.W.2d 480, 485 (1955); *Foster Trailer Co. v. United States Fidelity and Guaranty Co.,* 190 Tenn. 181, 186, 228 S.W.2d 107, 109 (1950); *Kerney v. Aetna Casualty and Surety Co.,* 648 S.W.2d 247, 252 (Tenn.App.1982); and *Nidiffer v. Clinchfield Railroad Co.,* 600 S.W.2d 242, 245 (Tenn.App.1980).

■ The existence of an agency relationship does not depend upon any written contract or even upon the intent of the parties. *Nidiffer v. Clinchfield Railroad Co.,* 600 S.W.2d 242, 245 (Tenn.App.1980), and *Rural Educational Association v. Bush,* 42 Tenn.App. 34, 43, 298 S.W.2d 761, 766 (1956). Rather, an agency relationship can be established by proof relating to the conduct of the parties themselves and other relevant external circumstances. *Electric Power Board of Metropolitan Government of Nashville and Davidson County v. Woods,* 558 S.W.2d 821, 824 (Tenn.1977), and *Sondgeroth v. Carrington,* 650 S.W.2d 737, 740 (Tenn.App.1982).

On at least two prior occasions, this Court has found that the contractual relationship between a lessor and its lessee was sufficient to establish an agency relationship for the purpose of Tenn.Code Ann. § 66–11–102(a). *Knox-Tenn Rental Co. v. Sarbec Corp.,* 59 Tenn.App. 564, 442 S.W.2d 652 (1968), and *Variety Fire Door Co. v. Hanson-Worden Co.,* 10 Tenn.App. 254 (1929). The Court in these cases determined that a lien could be attached to the lessor's interest because the contract between the lessor and lessee was made for the purpose of benefiting the lessor's fee simple interest. This determination was based upon four factors: (1) the lease required the lessee to construct a specific improvement on the lessor's property; (2) while the lessee was required to pay for the improvement, the cost was actually borne by the lessor who agreed to make corresponding offsets in the amount of rent the lessee paid; (3) the lessor main-

---

**6.** Hussmann had the burden of proving that an agency relationship between Alfred's and SPA existed. *Cobble v. Langford,* 190 Tenn. 385, 393, 230 S.W.2d 194, 197 (1950), and *Sloan v. Hall,* 673 S.W.2d 548, 551 (Tenn.App.1984).

tained control over the improvement; and (4) the improvement became the property of the lessor at the end of the lease.

On two other occasions, the courts have declined to impose a lien on the lessor's interest where the contractor or material supplier has failed to demonstrate that an agency relationship exists. In *Reed v. Estes*, 113 Tenn. 200, 202, 80 S.W. 1086, (1904), the Tennessee Supreme Court held that a lien would not attach to the lessor's interest because the lease did not require the lessee to make improvements. In *Thomas & Turner v. National Conservation Exposition Co.*, 137 Tenn. 1, 191 S.W. 348 (1917), the Tennessee Supreme Court declined to permit unpaid material suppliers to exercise their statutory remedies because they had entered into contracts with the lessee knowing that the improvements were to be built on leased property and because they were charged with notice that the lease, which involved two quasi-governmental entities as lessors, contained a provision restricting the right of the lessees to cause a lien to be placed upon the lessor's interest.

The criteria used by our courts to determine whether a lien should attach to a lessor's interest in real property are not dissimilar to those used by other state courts that have addressed this issue. See 53 Am.Jur.2d *Mechanics' Liens* §§ 131, 132 (1970), and 57 C.J.S. *Mechanics' Liens* § 65c (1948).

■ When these criteria are applied to the facts of this case, it becomes evident that Alfred's was not acting as SPA's agent when it contracted with Hussmann. The lease between Alfred's and SPA, as well as their course of conduct, makes it clear that SPA retained no control over the manner in which Alfred's equipped its supermarket. It did not require that any specific improvement be made, and there was no pass-through provision in the lease whereby SPA would pay for the costs of those improvements. Finally, the lease

specifically provided that the lessee, at its sole option, may remove any of the improvements it makes at the end of the lease. This supports a conclusion that the improvements Alfred's obtained from Hussmann would not materially benefit the lessor's fee simple interest in the property.

Hussmann in this case asserts that the refrigerant piping installed in the building is of permanent benefit to the lessor. We do not agree. The refrigerant piping installed by Hussmann was uniquely suited to its equipment.[7] Upon the removal of the coolers and other equipment upon the termination of the lease, the copper pipes remaining in the building, if in fact they remained, would be of marginal value because the installation of new or different equipment would necessitate the installation of new piping in different configurations.

Based upon the foregoing, we affirm the judgment of the trial court dismissing Hussmann's action on the ground that Alfred's was not acting as SPA's agent when it contracted with Hussmann to install refrigeration in Alfred's supermarket.

The costs of this appeal are adjudged against Hussmann and its surety for which execution, if necessary, may issue. The case is remanded for any further necessary proceedings.

TODD, P.J., and LEWIS, J., concur.

### OPINION ON PETITION FOR REHEARING

This Court filed its opinion in this case on June 14, 1985. The appellant filed its petition for rehearing twelve days later on June 26, 1985. Tenn.R.App.P. 39(b) provides:

A petition for rehearing must be filed with the clerk of the appellate court within 10 days after the entry of judgment unless on motion the time is shortened or

---

7. Hussmann's manager stated that the conduits in the building had to be modified to meet Hussmann's unique needs because they had

been installed originally for another manufacturer's equipment.

enlarged by the court or the judge thereof.

There appearing to be no extreme and unavoidable circumstances justifying this delay, we must conclude that the petition was not timely filed and that it should not be considered on its merits.

Were we, however, to consider the petition on its merits, we would deny it because it does not alter our original decision that the evidence does not preponderate against the findings of the trial court.

For the reasons stated herein, the petition for rehearing is respectfully denied.